IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


EDMOND C. GALLOWAY, Successor
Trustee of the JAMES D.
GALLOWAY Revocable Living Trust,
      Plaintiff

    v.            CIVIL ACTION NO. 05-50 ERIE

THE UNITED STATES OF AMERICA,
      Defendant



HEARING ON MOTIONS FOR SUMMARY JUDGMENT



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Thursday, April 6, 2006.




APPEARANCES:
      ARTHUR D. MARTINUCCI, Esquire, and I. JOHN DUNN,
      Esquire, appearing on behalf of the Plaintiff.

      JONATHAN D. CARROLL, Esquire, Trial Attorney,

U.S. Department of Justice, Tax Division,
appearing on behalf of the Defendant.




Ronald J. Bench, RMR - Official Court Reporter



2


1          P R O C E E D I N G S

2

3          (Whereupon, the proceedings began at 1:20 p.m., on

4   Thursday, April 6, 2006, in Courtroom C.)

5

6          THE COURT:  This is not going to be an evidentiary

7   hearing, is it, Mr. Martinucci?

8          MR. MARTINUCCI:  No, sir.

9          THE COURT:  This is the time that we've set for

10  argument on cross-motions for summary judgment at Civil Action

11  No. 05-50 Erie.  And we are about to enter the interesting

12  world of the split trust.  Let's hear from you first, Mr.

13  Martinucci.

14          MR. MARTINUCCI:  Yes, sir.  Your Honor, as you

15   noted, this is not an evidentiary hearing.  Procedurally, we

16   would start with the contention that there are no material

17   facts in dispute here.  We filed a concise statement of

18   material facts not in dispute in support of our motion for

19   summary judgment.  There was no response filed by the defendant

20   in that regard.

21          THE COURT:  Obviously, I'm going to hear from

22   government counsel, but as far as I'm concerned until I hear

23   something that convinces me to the contrary, there are no

24   material facts in dispute here.

25          MR. MARTINUCCI:  That's right.


                                3


1          THE COURT:  That's fine.

2          MR. MARTINUCCI:  We'll just move on from there.

3          THE COURT:  Now, Let me ask you a couple of

4   questions here, some groundwork questions.  And I'm now quoting

5   from 2055(e)(2), where an interest in property (other than an

6   interest described in Section 170(f)(3)(B)) passes from the

7   decedent for charitable purposes and an interest in the same

8   property passes for non-charitable purposes, no deduction shall

9   be allowed under this subsection for the interest which passes

10  for charitable purposes unless certain exceptions apply.  Now,

11  would you agree with me that that's the definition of a split

12  trust under the statute?

13       MR. MARTINUCCI:  No, sir, I would not.  And I think

14  that this is, if you look at our brief --

15       THE COURT:  Is that the purported definition of a

16  split trust?

17       MR. MARTINUCCI:  Yes, sir.

18       THE COURT:  So there is no confusion on my part, you

19  agree that that is the relevant portion of the relevant statute

20  that one would look to to determine what the statute drafter

21  felt was a split trust, is that correct?

22       MR. MARTINUCCI:  If we were to concede that -- the

23  court should just rely on the statutory language instead of

24  looking at the Congressional record --

25       THE COURT:  We're going to get to that in a second.


4


1   But that is the definition, that provides the definition --

2    aside from whether or not it is helpful or informative to look

3    further in search of intent, is that correct?

4         MR. MARTINUCCI:  Yes, sir.

5         THE COURT:  Okay.  On its face what is ambiguous

6    about that language?

7         MR. MARTINUCCI:  If you look at the statute as a

8    whole, as opposed to just parsing out that particular language,

9    and if you look at the basis for the statute, we believe that

10   that's where the ambiguity comes in.  Because 2055(a) starts

11   off with the general presumption that if you have something

12   going to a charity, it's going to be deductible.  If you look

13   at 2055(e), and this particular definition, it very narrowly

14   sets forth what it contends are the ways in which you can

15   accomplish that if there is a remainder trust, a split-interest

16   trust.  But it really doesn't define what a split-interest

17   trust is.

18         THE COURT:  Well, your position is, so I'm clear,

19   and if it isn't your position, tell me, that an otherwise

20   facially clear statute is rendered unclear by virtue of the

21   Congressional purpose behind the passing of a statute in the

22   first place, is that your point?

23         MR. MARTINUCCI:  I would say that would be one

24    argument that we would make.

25         THE COURT:  Okay.


                              5


1         MR. MARTINUCCI:  In terms of 2055(e) itself, though,

2    your Honor, we believe that there are ambiguities there -- if

3    you bear with me just for a moment until I pull out --

4         THE COURT:  Do you want to use the screen, is that

5    helpful or not?

6         MR. MARTINUCCI:  No, I think if you have it there in

7    front of you, I think that we can just make reference to it.

8         THE COURT:  All right, that's fine.

9         MR. MARTINUCCI:  The ambiguity comes in in that,

10   first of all, 2055(e)(2) really never tells you what a

11   split-interest trust is.  And it doesn't tell you what is meant

12   by an interest in the same property.  Now, it's our position

13   that there were, and this is where we get into issues like what

14   is or is not a divided interest trust or a competing interest

15   trust.  In our situation when Mr. Galloway died, his property

16   was all in trust.  At the moment of his death, his trust split

17   that property down the middle.  So now you have property for

18  the charitable beneficiaries and you have property for the

19  non-charitable beneficiaries.  And those are undivided

20  interests for each of those parties as of the moment of death.

21  And that's where we think that there's an ambiguity because

22  there is no clear definition here about what constitutes an

23  interest in the same property.  We're allowed to give property

24  to A, and we're allowed to give property to B, once we do that,

25  is it really interest in the same property.  Is it a divided

6

1  interest or is it an undivided interest.  We're saying that --

2      THE COURT:  In your papers to me, you implicitly

3  suggest your answer to your question.  And it seems to me to be

4  this.  That -- and this would fall under the category of form

5  over substance as far as you're concerned.  If the same

6  property passes to both charitable and non-charitable

7  instruments under one trust instrument, you satisfy the

8  split-interest trust.  So you suggest in your brief.

9      MR. MARTINUCCI:  The way that it's been

10  interpreted --

11      THE COURT:  Don't you -- and to round it out so it

12    doesn't sound like you're falling on your own sword because

13    you're not, you suggest that may be the likely definition, but

14    it's artificial given the unique circumstances of this case, is

15    that a fair statement?

16          MR. MARTINUCCI:  Yes.

17          THE COURT:  All right.

18          MR. MARTINUCCI:  Because if we had done this in a

19    will, if we had just said you get this 50 percent of the

20    property and you get this 50 percent of the property, we would

21    have been allowed a deduction.  If we had established and I

22    think it's important to keep in mind, that the amendments to

23    the trust that we're talking about and led to this situation --

24          THE COURT:  There were three?

25          MR. MARTINUCCI:  There were three.  They were all

7

1     done pro se by the individual.  He didn't have anybody's advice

2     in doing this.

3           THE COURT:  That doesn't matter.

4           MR. MARTINUCCI:  I know, but I think it's something

5     to at least keep somewhere in the back of the head.  But if we

6  had set up two trusts and put 50 percent over here and 50

7  percent over here, that wouldn't have been a problem.  If we

8  had done it in one trust, the way that we've done it here and

9  provided for annual distributions, it would be okay.  But

10  because we're doing distributions this year and then in 2016,

11  apparently, it's not okay.

12        THE COURT:  Let me ask you a couple questions about

13  this and get your response to it.  What am I to make of -- bear

14  with me a second if you would -- what am I to make of, for

15  instance, the Zabel opinion, 995 F.Supp. 1036, and the Fifth
                ‾‾‾‾‾

16  Circuit case, Johnson_v._U.S., for this principle.  Both those
                 ‾‾‾‾‾‾‾ ‾‾ ‾‾‾‾

17  cases pay more than lip service, they in part base their

18  decision upon the principle -- let me just read to you what the

19  Fifth Circuit says.  This is referring to 2055(e).  "We

20  consider the pertinent statutory language unambiguous.  There

21  is no justification for a judicial diminution of an unstated

22  Congressional intent to make an exception for the bequest in

23  this case.  To the same effect really as the District Court

24  case.  So my question is this.  How can I go in search of --

25  how can I apply to a particular unique set of facts the stated

1  Congressional intent or purpose in order to trump language

2  here; how can that ever be appropriate, wouldn't I end up being

3  the person who was, wouldn't I become a little Congressman

4  drafting and tweaking the language of the statute in ways that

5  I felt was appropriate?

6       MR. MARTINUCCI:  If you believed that the language

7  of the statute was unambiguous and shot down our arguments in

8  that regard, I suppose that you would be.  But we believe that

9  both the Johnson case, which I believe is a Fifth Circuit case,

10  and the Zabel case -- first of all, I don't think that those

11  cases were, with all due deference to those courts, correctly

12  decided.  And I do think that there is ambiguity in the statute

13  because there really is nowhere in the statute that says what a

14  split-interest trust is.

15       THE COURT:  Well, you anticipated my question, maybe

16  I asked it before, it really is I need to know from you, and

17  this is not suggesting you didn't take a good pass at it in

18  your papers, but the definition I just read to you is the

19  purported definition of what a split-interest trust is.  Are

20  you saying that it is unclear by omission or it is unclear by

21  commission, that is the words they used.  I don't understand

22  from whence springs the ambiguity, so I'm going to give you

23  another chance to tell me?

24       MR. MARTINUCCI:  I believe that it is unclear as a

25  result of omission.  Because they simply do not define what

9

1  they considered to be a split-interest trust.  The

2  Congressional record, the Senate report specifically says what

3  it believes a split-interest trust is and that language never

4  made its way into the statute.  Now, I don't think it's because

5  2055(e)(2) successfully defines what does or does not

6  constitute a split-interest trust because, again, there is

7  nothing in there that tells us what they mean by interest in

8  the same property.  And there also is the issue of the

9  regulation as adding the language in in trust, where it doesn't

10  appear in the statute itself.  I think that there is ambiguity

11  in 2055(e)(2).

12       THE COURT:  With respect to the regulation, to the

13  extent one even has to go through, I guess one would go through

14  there to the extent that you felt you needed some further

15  sketching of what the statute really meant, but be that as it

16  may.  Why wouldn't good old fashion Chevron deference apply to

—————————

17  that regulation, just like it would to any other number of

18  regulations?

19        MR. MARTINUCCI:  Because we believe that the

20  regulation is interpretative and not legislative.  And because

21  it is interpretative and not legislative, we don't have to give

22  it the deference due under Chevron.

—————————

23        THE COURT:  How much deference is it due?

24        MR. MARTINUCCI:  I think it's only due deference if

25  the court believes that it makes sense and harmonizes the


                                    10


1  intent of the statute with the underlying application of the

2  regulation.

3        THE COURT:  If I were to conclude that in some form

4  or fashion in order to round the statute out into something

5  that was perfectly clear, wouldn't that be the place I would go

6  if I felt there was some ambiguity to fill in the gaps?

7       MR. MARTINUCCI:  That would be the first place that

8  you would go.  That would be the first place that you would go.

9       THE COURT:  And if I were to go there, to the extent

10  that I didn't independently glean it from a reading of the

11  statute, it would tell me that a missing piece of the puzzle

12  was antitrust?

13       MR. MARTINUCCI:  But there the regulatory body is

14  now inserting itself in the role of a legislator.

15       THE COURT:  What do you think a split-interest trust

16  is?

17       MR. MARTINUCCI:  Bear with me here and I'll tell you

18  exactly.  I believe that a split-interest trust is a trust

19  which has a non-charitable income beneficiary and a charitable

20  remainder beneficiary or vice-versa.

21       THE COURT:  So, in your view, the lynch pin of split

22  trustum, if you will, is a remainder man?

23       MR. MARTINUCCI:  That's exactly right.

24       THE COURT:  Is the reason for that, is the reason

25  that you feel that is an essential component of a split trust,

11

1    is that without a remainder man, you have no one who might

2    potentially be taken to the cleaners?

3        MR. MARTINUCCI:  That's exactly right, your Honor.

4        THE COURT:  All right.  Now, let's talk about -- and

5    in discussing it I'm not suggesting it's relevance, because

6    I've reached no conclusion on the point.  But now let's talk

7    about the facts on the ground here and how under some scenario

8    a situation could obtain whereby the very mischief that the

9    drafters intended to avoid could occur here?

10       MR. MARTINUCCI:  Okay.

11       THE COURT:  Now, it's your position, I take it,

12   first of all, to set the stage, we started out with 25, 25, 25

13   and 25, we have two living beneficiaries?

14       MR. MARTINUCCI:  Yes, sir.

15       THE COURT:  A son and another relative.  The son who

16   happens to be the trustee, is that right?

17       MR. MARTINUCCI:  Yes, sir.

18       THE COURT:  We have two charitable beneficiaries, a

19   church and some affiliate of the church.  Something happened, I

20   presume, on January 1st of 2006.  There was a distribution, is

21   that correct?

22        MR. MARTINUCCI:  Actually, Mr. Steadman is here, the

23  information that I have is that it was actually March 1st when

24  the distribution was due.

25        THE COURT:  January 1st was the triggering event,

12

1  and at that point there would have been a distribution such

2  that the two living beneficiaries possessed 50 percent of the

3  corpus and the charities possessed 50 percent, is that right?

4        MR. MARTINUCCI:  The beneficiaries, all the

5  beneficiaries would receive -- if you put them into two buckets

6  instead of four, charitable and non-charitable, they each would

7  have received a 50 percent distribution of 50 percent of the

8  trust.

9        THE COURT:  So they got 25 percent?

10        MR. MARTINUCCI:  Exactly.

11        THE COURT:  All right.  Now, assuming that both

12  living beneficiaries live to January 1st of 2016, then they are

13  entitled to a distribution of the remainder of the corpus, is

14  that correct?

15        MR. MARTINUCCI:  They're entitled to a distribution.

16          THE COURT:  Of their percentage?

17          MR. MARTINUCCI:  Of their percentage of residue of

18  the corpus.

19          THE COURT:  So at that point they would get the

20  balance, the residue of the 25 percent and --

21          MR. MARTINUCCI:  Plus income.

22          THE COURT:  Plus income.  And at the same time the

23  charities would receive the residue of 25 percent, is that

24  correct?

25          MR. MARTINUCCI:  Yes, sir.


                            13


1           THE COURT:  And at that point that's the useful end

2  of the trust, it's done its work?

3           MR. MARTINUCCI:  That's it.

4           THE COURT:  Now, assume for the sake of discussion,

5  I think we can go beyond these individuals but still apply the

6  same situation?

7           MR. CARROLL:  Your Honor, I'm loath to interrupt the

8  court, I apologize -- the issue with the income, the income is

9  distributed annually.

10          THE COURT:  There's an annual income distribution?

11          MR. CARROLL:  Yes.

12          MR. MARTINUCCI:  We don't believe so.

13          THE COURT:  Well, I don't consider it material, at

14    least right now, we can talk about that later.  Maybe it is, I

15    don't think it is.  Let's see where was I -- get me back to

16    what we were talking about?

17          MR. MARTINUCCI:  You said you want to take it beyond

18    these facts.

19          THE COURT:  I posit to you this.  We have

20    beneficiaries, who are not too darn sure or in fact they are

21    pretty convinced because of unique and extreme health problems,

22    they're never going to see 2016, they're just not going to make

23    it.  So the attitude is kind of let's eat, drink and be merry,

24    generate as much high-risk income here as we possibly can and

25    let the chips fall where they may because we're never going to


14


1    get the rest of the corpus anyways.  And so they begin a

2    high-risk investment run, which results in some occasional

3    generation of some good income, but also a markedly lessening

4   of the corpus.  Now, the way this trust is set up, tell me if I

5   have this right because I think it's of some significance.

6   That the trustee, who is making decisions here, notwithstanding

7   the fact that the church already has 50 percent of what it's

8   ever going to get, the trustee's decisions, investment

9   decisions, fall equally upon both the fortunes of the

10  individuals and the fortunes of the charities?

11        MR. MARTINUCCI:  I don't believe that that's

12  necessarily true.  I don't think that there's any reason that

13  the trustee --

14        THE COURT:  How could it not be?

15        MR. MARTINUCCI:  Because the interest in the trust

16  passed 50 percent here and 50 percent here as of the date of

17  death, there's no reason why the trustee couldn't invest the

18  charitable portion in one set of investments and the

19  non-charitable portion in another.

20        THE COURT:  Or invest both portions in precisely the

21  same thing.

22        MR. MARTINUCCI:  Could, and as a matter of fact has

23  to this point in time.  The other thing, though, that comes

24  into play, and I have to flip through the brief here in order

25   to find the specific provision and point you to the right


15


1   exhibit, but this trustee limited the ability, the discretion

2   of the trustee, the grantor of the trust, limited the

3   discretion of the successor trustee to invest, he said there

4   are only certain types of investments that are going to be

5   okay.  And those are investments that have at least an A or B

6   rating within Standard and Poor's, here we go -- "the trustee

7   is limited in the quality of the investments he may select.

8   Specifically, it provides that he may only invest and reinvest

9   the money received from any sale of said stocks in corporate

10   stocks and bonds so long as they have an A or B rating with

11   Standard and Poor's."

12        THE COURT:  All right, that's the successor, that's

13   the individual who would follow young Mr. Galloway?

14        MR. MARTINUCCI:  No.  No.  That is young Mr.

15   Galloway as successor to his father's trust.  Successor

16   trustee.

17        THE COURT:  You're saying his discretion is somewhat

18   circumscribed?

19          MR. MARTINUCCI:  Absolutely, so he's not going to go

20   out and buy junk bonds.

21          THE COURT:  No, but there is circumscription and

22   there is circumscription.  Within that one can be more

23   conservative or less conservative?

24          MR. MARTINUCCI:  True.

25          THE COURT:  But here's the question then.  Can you


                              16


1   not conceive of a situation where based upon what one from the

2   outside might view as improvident investment, albeit for a

3   selfish purpose, the idea being use it while you have it

4   because you're not going to be around that long, couldn't

5   conduct like that theoretically result in a diminution in the

6   value of the corpus of the charitable interest?

7          MR. MARTINUCCI:  I believe that that scenario is

8   within the realm of possibility, but I don't believe that it is

9   within the realm of probability under the facts of this case.

10          THE COURT:  Let's flip to what you consider is a

11   traditional situation, and that is and when I say traditional,

12   what you consider to be a true split trust.  Now, enter stage

13  right to remainder man.  And the trust is set up in such a way

14  that upon the death of X, my children inherit upon my death --

15  and upon their death it reverts to the charity.  Your point is

16  there is a genuine interest, there could be, in investing and

17  living high off the hog, if you will, and let the corpus be

18  damned, so that you get the benefit of the deduction and yet

19  push forward with the full expectation that at the end of the

20  day secretly the charity isn't going to get a dime or not much?

21      MR. MARTINUCCI:  That's exactly right.  Under that

22  scenario there is actually an incentive for the life

23  beneficiary --

24      THE COURT:  Aren't we really talking about a

25  situation here that our flip sides of one coin.  Does it really


17


1  matter, and I ask you rhetorically, does it really matter what

2  the intent of the living beneficiary is insofar as doing in a

3  charity, if it potentially can do in the charity -- if you

4  follow my question?

5      MR. MARTINUCCI:  You're asking does it matter

6  whether or not somebody has a nefarious purpose at heart if the

7    potential exists for them to have that nefarious purpose or to

8    exercise --

9          THE COURT:  One man's nefarious purpose is another

10   man's legitimate expectation.  But whether you are driven by an

11   interest, self-interest that is based upon your heirs or

12   something else or driven by self-interest which, for instance,

13   is based upon an absolute expectancy that good is going to take

14   you home sooner rather than later, both of the scenarios can

15   resound to the detriment of the charitable interest, why aren't

16   they both functional split-interest trusts?

17          MR. MARTINUCCI:  It's a tough hypothetical.

18          THE COURT:  That's why I asked it.

19          MR. MARTINUCCI:  Let me get my head around it in

20   light of the facts of this particular situation.  Because,

21   again, we firmly believe that, first of all, we've done an

22   undivided interest.

23          THE COURT:  That's fair enough.  I think what you're

24   saying and I don't want to put words in your mouth, what you

25   seem to be saying is the likelihood for machinations are much

18

1  greater in a true remainder man situation than they would be in

2  this situation?

3      MR. MARTINUCCI:  Yes.

4      THE COURT:  But based upon the discussion we've had,

5  you would have to admit that you can't completely discount the

6  possibility that the scenario could occur that would impact

7  negatively on a charity -- through improvident management,

8  motivated by a desire to spend it while I'm here, as opposed to

9  it dissipates when I'm gone?

10     MR. MARTINUCCI:  I believe that -- just based on the

11  law of probabilities, I would have to say that yes, the

12  possibility exists.

13     THE COURT:  Most people don't have a crystal ball?

14     MR. MARTINUCCI:  Exactly.  But I don't think it

15  exists under these facts.  Could I see it existing under the

16  hypothetical you posited, but I don't believe it exists on the

17  facts of this case.

18     THE COURT:  Finally, then I'm going to hear from the

19  fellow from Washington.  Tell me if this is accurate.  The

20  strength of your position turns entirely in the first instance

21  on whether or not I find the statute is facially ambiguous?

22     MR. MARTINUCCI:  No.

23          THE COURT:  Well, if I find the statute is not

24   facially ambiguous, it nevertheless would be inappropriate for

25   me to go looking for Congressional intent?


                              19


1          MR. MARTINUCCI:  That's correct.

2          THE COURT:  If the statute is not ambiguous, if I

3   find it to be so, not ambiguous, then presumably I would find,

4   and if I were to find that the trust arrangement fits within

5   the four corners of an unambiguous statute, then you lose?

6          MR. MARTINUCCI:  If you make that determination that

7   it fits within the four corners.  Our first position is that

8   you never reach 2055(e) because we are not doing, we're not

9   dividing an interest in the same property, it ceased to the

10   same property when he died.  And now it's in two separate

11   buckets.

12          THE COURT:  That would be true -- it gets a little

13   metaphysical.

14          MR. MARTINUCCI:  As do many things involving the

15   Internal Revenue Code.

16          THE COURT:  Well, inexplicable.  But every res,

17  every single piece of property if it were to be shared by more

18  than one, there has to be a divide, some division.  So that in

19  fact, that split contemplates a division as long as it

20  originates from a single source, right?

21          MR. MARTINUCCI:  Yes, but I think that's where the

22  remainder issue comes in.  Because if you're talking about

23  giving somebody interest in the same property and you were the

24  beneficiaries --

25          THE COURT:  Is there a separate trustee in the case


                                    20


1  that is responsible only for running the investments of the two

2  charities that presently enjoy 50 percent of the corpus?

3          MR. MARTINUCCI:  No.  Nor does there need to be.

4  Because if we had two separate trusts, if we had two separate

5  trusts documents and the same trustee in charge of each, it

6  would be okay.

7          THE COURT:  And thus is artificial?

8          MR. MARTINUCCI:  Thus is artificial.

9          THE COURT:  All right, let me hear from other

10  counsel.

11          MR. MARTINUCCI:  Okay, sir.

12          THE COURT:  Mr. Carroll.

13          MR. CARROLL:  Thank you, your Honor.  I think you,

14   from your questions, I think you understand the United States's

15   argument, the statute is --

16          THE COURT:  I understand it, just like I understand

17   his argument.  In understanding both, I have no firm opinion as

18   to with which I agree.  That having being said, let's begin our

19   discussion.

20          MR. CARROLL:  Sure.  I don't think we need to get

21   into really the facts -- the later part of your question about

22   how the trustee operates, if he can manipulate it.  But two

23   facts do appear --

24          THE COURT:  I'll be the judge of that.

25          MR. CARROLL:  Two facts that appear to be a little


                                    21


1   in dispute, one, that the income is distributed annually and

2   that both are required to have the same investments.  In an

3   exhibit that was attached to the United States' motion for

4   summary judgment -- it's Government Exhibit 1, it's the formal

5    protest to the Internal Revenue Service.  In the 6th paragraph.

6    It says both are required to have the same investments, both

7    have the same amount of principal.  Both receive the income.

8         THE COURT:  All right, I appreciate that.

9         MR. CARROLL:  I don't think, the United States

10   doesn't think you need to get there.

11        THE COURT:  Let's see where we go before we decide

12   where we're going to end.  Let me ask you is, is there a true

13   remainder interest here and, if so, where the heck is it?

14        MR. CARROLL:  Yes, the remainder interest, I'll say

15   for ease of reference, is charitable and non-charitable.  Each

16   of them are the charitable will receive, I guess it would be 25

17   percent now, assuming 50 percent has been distributed.  So

18   charities will receive the 25 percent that's remaining at the

19   end of 16 years.  Assuming that other half has already been

20   distributed.

21        THE COURT:  If there is a remainder interest here in

22   the classic sense, is there a real risk here and, if so, what

23   is it -- that the individual beneficiaries will attempt to

24   maximize income -- given the entire corpus will be equally

25   distributed in 2016?

22

1       MR. CARROLL:  Yes, because you're talking about one

2  single person, they could be in ill health or just human nature

3  being what it is, might want the income right now.

4       THE COURT:  Human nature is a lot of things.  In the

5  typical remainder man situation, that may have been the impetus

6  or apparently was the impetus in part for the passage of this,

7  you can kind of facially see what was going on and why it was

8  going on.  But posit for me in this case what the real risk is

9  and from whence it would spring?

10      MR. CARROLL:  The real risk would be that the

11  individuals would say I want, which the trustee happens to be

12  one of the individuals, it would say to themselves they want an

13  income now.  They don't want to wait 16 years to receive the

14  property.

15      THE COURT:  They are getting income anyways.  Are

16  you saying that there would be a temptation on the part of the

17  trustee to be less conservative?

18      MR. CARROLL:  That's exactly what I'm saying.  They

19  would be more inclined to invest in riskier investments, which

20   almost by definition is riskier.

21         THE COURT:  In other words, they would be more

22   inclined to throw the craps, if you will, put more money on the

23   table in the hope of getting bigger returns, all the while

24   perhaps when something becomes a cropper, dissipating the

25   corpus?


23


1          MR. CARROLL:  That's correct.  There is also another

2   factor that is pretty important.  If one of these beneficiaries

3   dies, they get nothing.  Their heirs get nothing.

4          THE COURT:  Now, Mr. Martinucci says that but for

5   the stroke of a pen; in other words, if a trust, separate one

6   trust for the individuals and one trust for the charities had

7   been set up, not under a single instrument, if you will, but

8   two separate trusts, even if controlled by the same trustee,

9   the IRS would never have come knocking at that door, is that

10   correct?

11         MR. CARROLL:  Yes, that would be correct.  Because

12   the statute would not come into play, 2055(e)(2).

13         THE COURT:  Though, we're going to mosey down that

14  road a little bit, even though the government doesn't think

15  there's anything at the end of it.  But given the scenario of

16  two separate trusts -- same players we have here, same trustee,

17  same beneficiaries, wouldn't it be possible for the trustee to

18  orchestrate the same mischief under those circumstances; in

19  other words, eat, drink and be merry because I might be alive,

20  that they would be able to do under these circumstances?

21          MR. CARROLL:  No.  I guess I was assuming what you

22  meant by it was separate, the income would not -- from a

23  separate trust.

24          THE COURT:  This is completely separate, there is no

25  spill over?


                                24


1          MR. CARROLL:  Yes.  Certainly if there was spill

2  over, then that would be a different issue, then you might even

3  say they're not really two separate trusts.

4          THE COURT:  Then it would be artificial?

5          MR. CARROLL:  Yes.  Because the income is shared

6  here --

7          THE COURT:  I'm not asking you to put your tax

8    planner hat on because once you get out in private practice, as

9    probably you will some day, then you can do it.  Now you're

10   representing the government.  Hypothetically, what could they

11   have done here by your lights to have avoided the anvil of a

12   split-interest trust?

13        MR. CARROLL:  It's quite simple in the sense it's

14   set out, the statute says unless it's one of these three

15   things.

16        THE COURT:  Annuity, a unitrust and something else?

17        MR. CARROLL:  An annuity trust, a unitrust or a

18   pooled income fund.  If it's one of those three.

19        THE COURT:  I think you answered the question by the

20   lack of citation in the government's brief, are there no Third

21   Circuit cases dealing with this specific issue that you're

22   aware of?

23        MR. CARROLL:  No, there is.  We cited in fact this

24   District Court --

25        THE COURT:  Third Circuit, not just a district?


25


1         MR. CARROLL:  Appellate, there is one -- we didn't

2  cite it.

3        THE COURT:  Was it unhelpful?

4        MR. MARTINUCCI:  It was a Tax Court opinion that was

5  affirmed by the Third Circuit.

6        THE COURT:  And when I say was it unhelpful, I was

7  being facetious, you would call both good and bad to my

8  attention.  What proposition does it stand for?

9        MR. CARROLL:  It's very similarly along the Zabel
                                                    _____

10  opinion.

11        THE COURT:  What is the citation?

12        MR. CARROLL:  One minute, your Honor.

13        THE COURT:  Sure, go ahead.  Do you have the case

14  physically with you?

15        MR. CARROLL:  I don't, I apologize.

16        MR. MARTINUCCI:  If it's the Estate_of_Edgar case,
                                        _____ __ _____

17  Tax Court affirmed without opinion by the Third Circuit, it's

18  in both our briefs.

19        THE COURT:  Was that it?

20        MR. CARROLL:  I believe that's it.

21        THE COURT:  I stand corrected.

22        MR. CARROLL:  I don't believe I discussed it in any

23   great detail.

24        THE COURT:  What else do you want to tell me, if

25   anything, Mr. Carroll?


26

1        MR. CARROLL:  Well, the first thing is the statute

2   is clear on its face, you don't have to go beyond the statute.

3        THE COURT:  What is a split-interest trust?

4        MR. CARROLL:  As it's defined in the statute, which

5   says a split-interest trust is a trust that splits the same

6   property between charitable and non-charitable beneficiaries.

7        THE COURT:  Do you need the remainder interest in

8   order to have a split-interest trust under the statute -- he

9   says you do, he says the thing that makes a split-interest

10   trust is a true split-interest trust?

11        MR. CARROLL:  Do you need a remainder interest --

12   well, there would need to be some contingency, otherwise, it

13   would be just giving some of the property to charity and giving

14   some of the property not to charity, by definition.

15        THE COURT:  Some charitable entity would get

16   something some day?

17        MR. CARROLL:  Yes, it has the remainder.

18        THE COURT:  Your position is that this case is

19  remainder interest?

20        MR. CARROLL:  That's precisely this case.  The

21  plaintiff's argue the statute is ambiguous, I guess the

22  language in the same property.  It doesn't appear that could be

23  less ambiguous.  It's the same property, which is the

24  decedent's estate, if it's split up, that's the property the

25  statute refers to.


                                27


1         THE COURT:  Does it cause you any pause that the

2   decedent in this case, prior to his death, determined precisely

3   how and what percentage of the proceeds would pass?

4         MR. CARROLL:  The proceeds, you mean the corpus --

5   at the end of the 16-year period?

6         THE COURT:  Yes.

7         MR. CARROLL:  No.  The main problem really, if

8   you're looking at sort of intent, it's the issue of what

9   happens with the property in that period of time and what

10   happens with the income.

11          THE COURT:  Thank you, Mr. Carroll.

12          MR. CARROLL:  You're welcome.

13          THE COURT:  Do you have something else, Mr.

14   Martinucci?

15          MR. MARTINUCCI:  If I could just briefly, your

16   Honor, at least as briefly as I ever will be.

17          THE COURT:  All right.

18          MR. MARTINUCCI:  There are a couple of points that

19   I'd like to make.  The first one and I won't purport that this

20   is a quote from Mr. Carroll, but I think it's a fair paraphrase

21   of his answer to one of your questions.  If there is no

22   remainder, what we are talking about here is giving some

23   property to a charitable interest and some property to a

24   non-charitable interest.  That constitutes the facts of this

25   case.  If there is an undivided interest, it's okay.  The only

28

1   problem comes in, the only time you even have to get to 2055(e)

2   is if you decide that that is a divided or a split interest in

3   this same property.  I respectfully submit that you can't get

4   there without there being a remainder.  And for all that Mr.

5 Carroll said, with all due respect to the government's

6 position, there is no remainder here.

7      The other point is, your Honor, that one of the

8 evils that this Section 2055(e) was supposedly passed in order

9 to prevent is a situation where somebody says I will eat, drink

10 and be merry, principal be damned.  Because I'm going to get an

11 income while I'm alive.  In this situation that risk doesn't

12 exist because both parties are splitting the income as well.

13 If the charitable -- if the non-charitable beneficiary --

14      THE COURT:  Not to interrupt you, in other words,

15 when the high risk roller beneficiary periodically hits the

16 jackpot --

17      MR. MARTINUCCI:  Yes, sir.

18      THE COURT:  That the quarters that pour out of the

19 machine fall not only into his hands, but the charity's hands

20 as well?

21      MR. MARTINUCCI:  Absolutely.

22      THE COURT:  All right.

23      MR. MARTINUCCI:  To the extent that arguably if we

24 take the hypothetical to the extreme, to the extent that

25 somebody makes a mint in income and gets the benefit of that at

1  various points during the distribution of the trust, the

2  charities are going to get that benefit as well.  The other

3  thing is, your Honor, I would invite you to look at

4  Government's No. 1, paragraph six, I was not able to spot --

5  I was just looking through it, again very quickly, I was not

6  able to spot anywhere it said the income was distributed

7  annually.

8          THE COURT:  Does it matter?

9          MR. MARTINUCCI:  Realistically, no.  Again, because

10  of the unequal split of income.

11          THE COURT:  When do you think the income is

12  distributed in?

13          MR. MARTINUCCI:  In 2016.

14          THE COURT:  So there's only two interest

15  distributions, is that right?

16          MR. MARTINUCCI:  Yes, sir.  Under these facts it

17  probably doesn't matter if income is distributed annually

18  because then, again, he gets an equal benefit of it as the

19  years go on.

20        THE COURT:  This is probably irrelevant.  If you

21   know, why was the trust set up this way?

22        MR. MARTINUCCI:  I don't know.  I don't think

23   anybody here in the room knows because it was set up by Mr.

24   Galloway, Sr., as a grantor by himself.  I think the initial

25   trust document may have been prepared with the assistance of


                              30


1    counsel, but the amendments are on there.  We actually don't

2    know why he decided to do it in that particular fashion, we

3    just don't know.

4        THE COURT:  And obviously never will.  All right,

5    we'll get something out.

6

7        (Whereupon, at 2:06 p.m., the proceedings were

8    concluded.)

9

10                     - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


31


1          C E R T I F I C A T E
           _ _ _ _ _ _ _ _ _ _ _

2

3

4      I, Ronald J. Bench, certify that the foregoing is a

5  correct transcript from the record of proceedings in the

6  above-entitled matter.

7

8

9

10  _____

11  Ronald J. Bench

12

13

14

15

16

17

18

19

20

21

22

23

24

25